## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **CAROL A. WILSON***, et al.***,** | ) | Case No.: 2:16-cv-1084 |
| | ) | |
| *Plaintiffs,* | ) | Chief Judge Edmund A. Sargus |
| | ) | |
| *vs.* | ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |
| **CHAGRIN VALLEY STEEL** | ) | |
| **ERECTORS, INC., et al.** | ) | **DEFENDANT'S BRIEF IN OPPOSITION** |
| | ) | **TO PLAINTIFF'S MOTION FOR** |
| *Defendant / Third-Party Plaintiff* | ) | **SUMMARY JUDGMENT** |

Defendant/Third-Party Plaintiff Chagrin Valley Steel Erectors, Inc. ("Chagrin Valley") requests that this Court deny Plaintiffs Carol A. Wilson and the Trustees of the various named Ohio Operating Engineers Funds (collectively, the "Funds") and Third-Party Defendant Justin Helmick's ("Helmick") Motion for Summary Judgment ("Motion," ECF No. 35). This case is rife with genuine disputed facts prohibiting judgment as a matter of law in the Funds' and Helmick's favor. Indeed, the overwhelming evidence actually supports judgment in Chagrin Valley's favor on all counts of its complaint, counterclaim and third-party complaint.[1]

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  For years, Chagrin Valley timely paid fringe benefits on behalf of employees for the hours they performed operator work, with the Funds' full knowledge and agreement.

Chagrin Valley is in the business of fabricating and erecting structural steel. It has been serving Ohio since 2000. (Affidavit of John Ruple ("Ruple Aff."), attached hereto as Exhibit A, at ¶3.) Although it is a small, family-owned company, Chagrin Valley has developed a reputation in the construction industry for its quality work and its integrity. (*Id.*) Chagrin Valley's employees include family members who are related to John Ruple, one of the two owners and Vice President of Chagrin Valley. (*Id.* at ¶¶1, 4.) These family members / employees (the "Family Members") perform "shop work," including general business operations, and "operator work," which included operating Chagrin Valley's one crane and boon truck. (*Id.* at ¶5.)

Since at least 2005, Chagrin Valley contributed fringe benefits to the Funds pursuant an International Union of Operating Engineers, Local Nos. 18, 18A, and 18B (the "Union") collective bargaining agreement to which Chagrin Valley agreed to participate. Simply, Chagrin Valley paid fringe benefits to the Funds when its

---

[1] Chagrin Valley's Motion for Summary Judgment is being filed simultaneously with this brief in opposition.

covered employees, including the Family Members, performed "operator work" (e.g., operating a crane) and did not pay fringe benefits when these employees performed "shop work" (e.g., general business operations).  All of Chagrin Valley's payroll records, which it regularly submitted to the Funds since 2005, and which the Funds routinely audited and approved, clearly evidenced Chagrin Valley's fringe benefit contribution calculation methods. (*Id.* at ¶6.)

The Union expressly permitted these calculations, and the Funds agreed to and accepted these calculations and contributions for years.  (*Id.*).  For example, on October 1, 2009, the Funds agreed and accepted, after its review of Chagrin Valley's records for the period of July 2005 to August 2009, Chagrin Valley's fringe benefit contribution calculation methods.  In other words, the Funds and the Union agreed that Chagrin Valley would only pay fringe benefits for the hours its covered employees, including the Family Members, performed "operator work" in the field related to construction equipment operations. (*Id.* at ¶7.)

In 2009, Chagrin Valley agreed to continue paying fringe benefit contributions to the Funds pursuant to a renewed agreement to participate in the Union collective bargaining agreement (the "2009 CBA").  (*Id.* at ¶8.) Chagrin Valley continued to make full and timely fringe benefit payments to the Funds under the 2009 CBA for the hours that its Family Members performed "operator work," in accordance with its practices and procedures, which had been approved by the Funds since 2005. (*Id.* at ¶9.)  Neither the Funds nor the Union ever provided Chagrin Valley with any reason to doubt that the 2009 CBA only applied to the Family Members when they performed "operator work," as had been the parties' agreed practice since at least 2005. (*Id.* at ¶10.)

Indeed, Chagrin Valley routinely submitted weekly records and reports to the Funds detailing the hours that were worked, the wages that were paid, and the contributions that were made to the Fund with respect to those hours.  The Funds audited and approved Chagrin Valley's records.  Despite knowing exactly how Chagrin Valley calculated its fringe benefit payments, the Funds never once mentioned that Chagrin Valley was not in compliance with the 2009 CBA.  (*Id.*)  For example, on November 2, 2011, the Funds agreed and accepted Chagrin Valley's fringe benefit contribution calculation methods, after its review of Chagrin Valley's records for the period of August 2009 to October 2011, in which the Funds "compared the hours paid to the hours reported." In fact, the Funds determined that Chagrin Valley overpaid its contributions.  (*Id.* at ¶11.)

When the collective bargaining agreement between the Union and the Construction Employers

Association (to which Chagrin Valley is not a member) was being renegotiated, Chagrin Valley executed the Construction Employers Association Agreement Building Construction Agreement and the "Short Form Building Construction Agreement" on or about June 20, 2012 (the "2012 CBA"), which states that "The Agreement … shall remain in full force and effect *unless modified by the parties*."  (Short Form Building Construction Agreement at §3) (emphasis added).  (*Id.* at ¶12.)  Chagrin Valley continued to timely and fully make all fringe benefit payments and contributions under the 2012 CBA in the same manner it had done for years -- for the hours that its covered employees, including the Family Members, performed "operator work" -- with the Funds' and the Union's express knowledge and approval.  (*Id.* at ¶13.)  For example, the Funds indicated "no findings [of delinquent contributions]" in its 3/14/13 audit of audit of Chagrin Valley's October 2011 through February 1, 2013 because:

- "fringe hours remitted equaled the 'Operating Hours' worked"
- Vicki Ruple of Chagrin Valley advised that "fringes were paid on Crane Work only, that when they worked in the shop/fabricating, these hours didn't require fringes, that was the agreement when [Chagrin Valley] signed up."
- The Fund contacted Don Taggert [of the Union], who "was aware of the split time, that 'fabricating work' wasn't under Local 18 descriptions."
- "Based on the above, no additional findings were noted."

*See* Exhibit B-1 hereto.[2]  The Funds confirmed its continued agreement to and acceptance of Chagrin Valley's fringe benefit calculations to Chagrin Valley on April 25, 2013. (Ruple Aff. at ¶13)  The Union also confirmed, in writing, that it permitted Chagrin Valley's calculation methods:

> I [the Union] have allowed [Chagrin Valley] to use the residential [non-union] rate on his private work these members [the Family Members] do in the shop only at the rate of $26.10. He [Chagrin Valley] pays full rate to his operators in the field.

 *See* Exhibit B-2 hereto.

### B. The Funds suddenly demanded payment for non-operator work.

In late 2014 / early 2015, the Union advised Chagrin Valley that in direct contradiction of Chagrin Valley's, the Funds, and the Union's approved practices in place for almost nine years, the Funds, at the Union's direction, *may* start expecting fringe benefits for *all* hours (operator hours and shop hours) worked by Chagrin

---

[2] Notably, the Funds did not produce this document in its discovery responses to Chagrin Valley, among others that it authored or received in their ordinary course of business.  The Funds further admit that they failed to preserve or retain certain information or documentation, including documents generated after the commencement of this litigation. (*See* ECF No. 49 at p. 9 and its Exhibit A).

Valley employees.  (*Id.* at ¶15.)  The Union advised Chagrin Valley that this was due to a change in leadership with the Union, that Chagrin Valley could expect an audit of its records, but to "not worry about it," because the Union had "done this with other contractors and it worked out fine."  (Ruple Aff. at ¶15.)  In May 2014, the Funds audited Chagrin Valley's records, and in July 2014, Chagrin Valley received written notice from the Funds that their "recent audit findings" found Chagrin Valley delinquent in its fringe benefit contributions in the amount of $58,233.23 for the period between February 2013 to May 2014.  (*Id.* at ¶16.).

Throughout the following months, Chagrin Valley routinely communicated with the Union to understand and resolve the Funds' position, given the benefits now in question were paid in same manner that Chagrin Valley had paid for ***nine years*** in accordance with the applicable agreements, and with Funds' and the Union's full knowledge and express agreement.  (*Id.* at ¶¶17-18.)  Meanwhile, desiring to maintain its excellent relationship with the Union, and on the direction of the Funds, in August 2014, Chagrin Valley advised that going forward, it would pay fringe benefits for all hours (shop and operator) worked by Chagrin Valley employees covered by the 2012 CBA.  (*Id.* at ¶19.)  Chagrin Valley has, in fact, done so at all times since August 2014, and continues to do so today.  (*Id.*), *see also* Victoria Ruple Deposition at p. 27 and Errata Sheet (Attachments 1 and 2 to ECF No. 36).[3]  Indeed, Chagrin Valley submitted payroll records to the Funds in this lawsuit which also confirm John and Victoria Ruple's statements.

In October 2014, Chagrin Valley met with the Union to discuss the alleged balance asserted by the Funds against Chagrin Valley. At that time, the Union suggested a waiver of certain percentages of the allegedly unpaid benefits (e.g., a reduction in the amount claimed due by the Funds).  Chagrin Valley disagreed with the Union's "percentage waiver" determinations, and requested that the Union explain and itemize how it arrived at these calculations, which to date it never received. (*Id.* at ¶20.)

The Union then suggested that the Family Members provide statements to both the Union and the Funds that they were never under the impression that they would be receiving fringe benefit payments in connection with non-operator work, and they waived the right to collect any such benefits.  (*Id.* at ¶21.)  The Union also informed Chagrin Valley that if Chagrin Valley signed the suggested waivers relative to the Family Members,

---

[3] This Court denied the Funds' Motion to Strike Victoria Ruple's Errata Sheet. (ECF No. 51.)

then Chagrin Valley would not be responsible or liable for <u>any</u> allegedly past due fringe benefit balances asserted by the Funds.  The Union advised Chagrin Valley that the Funds did this for other contractors in the situation as Chagrin Valley, including Cook Paving and Construction, Inc., and that upon the Funds' receipt of the requested waivers, the Funds and the Union "wrote-off" the unpaid fringe benefit contributions allegedly due from these entities.  (*Id.* at ¶22.)

The Union provided Chagrin Valley with the proposed waiver forms for the Family Members to execute, which they did in December 2014, and which Chagrin Valley immediately provided to the Union.  (*Id.* at ¶23.)  The Union then advised Chagrin Valley that the executed waivers were being rejected because the Funds desired the waivers executed "in their [the Funds] form" on "their [the Funds] letterhead."  (*Id.* at ¶24.)  The Funds also advised Chagrin Valley that if it didn't execute the waivers on the Funds' preferred form, there would be "no deal" on the waivers.  (*Id.*)

The Union returned the rejected waivers to Chagrin Valley in January 2015.  (*Id.* at ¶25.)  Several months later, the Union provided Chagrin Valley with the proposed waivers in the Funds' preferred format, and the Family Members signed the waivers in April 2015.  Chagrin Valley then personally dropped the original executed waivers at the Union's offices in Cleveland, Ohio.  (*Id.*)

Thereafter, and to date, Chagrin Valley received and continue to receive notices from the Funds alleging that Chagrin Valley failed to fully pay certain fringe benefit contributions pursuant to the Agreements. As a result, the Funds also assessed retroactive late fees and penalties for Chagrin Valley's allegedly delinquent contributions.  (*Id.* at ¶26).  In response, Chagrin Valley repeatedly requested explanations and details relative to the Funds' audit "findings," determinations and concerns, and exhaustively attempted to resolve the issues, which the Funds either ignored, failed to satisfactorily respond, or responded by demanding payment of the full amount claimed due plus late fees, interest and other charges.  (*Id.* at ¶27).  Indeed, the Funds repeatedly threatened Chagrin Valley that if it did fully pay the amount claimed due by the Funds, they would do everything possible to "put Chagrin Valley out of business."  (*Id.* at ¶28.)  Meanwhile, Chagrin Valley, at all times, continued and continues to pay all of its fringe benefit contributions for all hours (operator and shop) worked by its employees covered by the applicable agreements.  (*Id.* at ¶29.)

Despite this, the Funds applied and continue to apply all current fringe benefits paid by Chagrin Valley

to its unilaterally-determined oldest outstanding balance allegedly due, over Chagrin Valley's repeated objections.  (*Id.*) (Funds Depo. I at p. 36).  Interestingly, the Funds applied the "waiver reduction" suggested by the Union in a manner not understood by the Funds, and never agreed to by Chagrin Valley, to the amount claimed due.  (*See* Fed.R.Civ.P. 30(b)(6) 8/17/17 partial deposition of the Funds ("Funds' Dep. I") at pp. 30-33 (full transcript, with exhibits, being filed simultaneously with, but separately from, this opposition).

### C.  The Funds' actions negatively impacted Chagrin Valley.

The Funds' actions significantly impacted Chagrin Valley's business operations, and continue to do so today.  For example, the Funds interrupted and/or discontinued certain benefits, including health insurance benefits, to Chagrin Valley's employees covered by the Agreements due to Chagrin Valley's allegedly delinquent fringe benefit contributions.  (*Id.* at ¶30); *see also* the Funds' Supplemental Response to Chagrin Valley's Interrogatory Nos. 7 and 8, attached hereto as Exhibit C.  Tellingly, despite always paying the Family Members for operator hours worked, the Funds never canceled the Family Members' health insurance benefits until 2017, further evidencing the Funds' knowledge of and agreement to Chagrin Valley's fringe benefit contributions through July 2017.  (*Id.*)

Additionally, in March 2014, Chagrin Valley and the Union agreed that Chagrin Valley would provide and pay Anthony Urch fringe benefits for at least 2,000 hours per year (the "2,000 Hour Agreement").  (Ruple Aff. at ¶14.)  The Union at times pulled Anthony Urch away from Chagrin Valley to work on other jobs, thereby forcing Chagrin Valley to not comply, through no fault of its own, with the 2,000 Hour Agreement.  Although this impacted Anthony Urch's health insurance eligibility, the Union and the Funds' agreed to not consider this against Chagrin Valley's obligations or Mr. Urch's benefits.  (*Id.* at ¶31) (Funds Dep. I at p. 39.)

Indeed, just last week, Mr. Urch, who is Chagrin Valley's only certified crane operator, quit his employment with Chagrin Valley due to his lack of health insurance and other benefits.  The Union advise Chagrin Valley that irrespective of Chagrin Valley's offer to pay Mr. Urch's COBRA fees to ensure the continuance of his health insurance, the Union encouraged Mr. Urch to quit Chagrin Valley, and promised him temporary employment with other companies, which they in fact provided him in complete disregard for the Union's practices and procedures relative to placing "out of work" members for temporary employment.  (Ruple Aff. at ¶32.)

As a result, Chagrin Valley cannot honor its 2,000 Hour Agreement, and it cannot fill its contractual obligations as it has no employees to operate its crane in accordance with Union guidelines. Furthermore, all other certified crane operators refuse to work for Chagrin Valley, even temporarily, because they will not receive any health insurance or other benefits - - even though Chagrin Valley continues to fully pay all fringe benefits, the Funds are applying these payments to the oldest, and disputed, allegedly outstanding balance, rendering the fringe benefits for current work as unpaid. (*Id.* at ¶33.)

Finally, since 2015, Chagrin Valley, without admitting to any liability whatsoever (which it vehemently disputes), and purely as a business decision to put this situation behind it and focus on its business operations, offered to fully satisfy the principle amount claimed due by the Funds in a timely fashion. The Funds summarily rejected each offer and responded by demanding the full amount of its disputed claim, including interest, late fees and attorneys' fees, which essentially quadruples the Funds' claims. Given the Funds' threats to "put Chagrin Valley out of business if it didn't pay" and its actions described herein, it is apparent that the Funds are coercing and extorting Chagrin Valley into paying a disputed claim that is not actually due or owing.

**D. Helmick and the Funds intentionally damaged the relationship between Chagrin Valley and one of its most important customers.**

Of note, Chagrin Valley is a subcontractor to Ruple Builders, Inc. ("Ruple Builders") on the Ohio Operating Engineers Training Facility construction project (the "Project").[4] (*Id.* at ¶37). John Ruple is the Vice President, and one of two owners, of Chagrin Valley, and the President and sole owner of Ruple Builders. (*Id.* at ¶1.) Ruple Builders contracted with Infinity Construction Co., Inc. ("Infinity") on the Project, who in turn contracted with the Project owner, the Ohio Operating Engineers Apprenticeship Fund, a Plaintiff in this lawsuit. (*Id.* at ¶37) (Wilson Aff. at ¶9, ECF No. 35, Ex. A.) Infinity is one of Chagrin Valley's best customers. (Ruple Aff. ¶34.)

On November 10, 2016, the Funds and Helmick contacted Infinity to misrepresent as follows:

*Hello, per our conversation Infinity Const. has Chagrin Valley Steel Erectors subcontracting on a project at the Local 18 Richfield Training Site. Unfortunately Chagrin Valley is not in good standing with our office. Attached is a letter stating the balance of contributions owed. Any help in this matter to get them paid in full would be greatly appreciated. Let me know if you require*

---

[4] Chagrin Valley and Ruple Builders are wholly separate entities. Chagrin Valley is a "labor force" company, and only provides labor to companies with whom it subcontracts for construction projects throughout Northeast Ohio, including Ruple Builders. (Ruple Aff. at ¶38.)

*any additional information.*

(the "Email") (*See* Fed.R.Civ.P. 30(b)(6) 10/26/17 partial deposition of the Funds ("Funds Dep. II") at p. 74 and its Exhibit E (full transcript, with exhibits, being filed simultaneously with, but separately from, this opposition); (Ruple Aff. at ¶34).

When asked about the Email, Helmick first testified that he acted solely on his own volition, but then later testified that he acted on the instruction of Carol Wilson of the Funds. (Funds Dep. II at p. 77). Regardless, the Funds and Helmick admit that they were aware that at the time of the Email, Chagrin Valley disputed the amounts claimed due by the Funds. (*Id.* at p. 85.) The Funds and Helmick also admit that at the time of the Email, no court judgment or legal determination existed finding Chagrin Valley liable for the disputed amount. (*Id.* at p. 86.) Meanwhile, the Funds admit that the only way a contractor can dispute the Funds' determinations is to file a lawsuit. (Funds Dep. I at p. 18).

The Funds and Helmick also unbelievably claim that their sole purpose in sending the Email was to obtain payment of Chagrin Valley's disputed fringe benefits - - ***from Infinity***:

| | |
|---|---|
| Q. | But you had some sort of expectations from this e-mail? |
| A. | Yeah. The expectation was to have the audit paid, um-hmm. |
| Q. | Right. How did you think sending the e-mail was going to get the audit paid? |
| A. | For Infinity to pay it. |
| Q. | And that's the only expectation that you had, that Infinity would pay the audit? |
| A. | Yes. |
| Q. | You had no other expectations? |
| A. | No. |
| Q: | So is there any other reason why you would have sent that e-mail? |
| A. | No. |

(Funds Dep. II at p. 82.) Interestingly, the Funds and Helmick admit that Infinity had never paid the fringe benefits of any contractor in the past. (Funds Dep. II at p. 81.) They also admit that they never actually articulated this alleged "sole expectation" to Infinity:

| | |
|---|---|
| Q. | Okay. So just so I'm clear, the only reason you sent that e-mail was the expectation that Infinity might pay those contributions? |
| A. | Correct. |
| Q. | Did you say that in the conversation with Infinity? |
| A. | I don't recall. |
| Q. | Does the e-mail say that? |
| A. | What was the question? |
| Q. | When you spoke with Patrick or in that e-mail, did you say at any time I'm reaching out to you to ask you, Infinity, to pay the contributions that are owed by Chagrin Valley? |
| A: | I said exactly what's in this e-mail. The e-mail states any help in this matter to get them get |

paid in full would be greatly appreciated.

Q.      The e-mail does not state anywhere that your sole expectation was that Infinity would make those payments?

A.      No, this e-mail does not say that.

(Funds Dep. II at pp. 83-84.)  Immediately upon receipt, Infinity contacted John Ruple to advise:

> *Here is a letter from Operating Engineers telling us that Chagrin Valley owes over $60,000 in benefits to the union.  It is my understanding that we recently changed our subcontracts on 2 jobs, oddly enough, one of them being the Operating Engineers Training Facility from Chagrin Valley to Rupple [sic][Builders].  Whatever the dangerous game that John and Vicki are playing we want no part of it.  Patrick told the Operating Engineers that we currently have no contracts with Chagrin Valley. Please tell John and Vicki to get this rectified ASAP or we will hold payments on the Operating Engineers project and cease awarding them any more work.*

(Ruple Aff. at ¶34) (Funds Dep. II at 99-100 and its Exhibit E.) The next day (November 11, 2016), Chagrin

Valley responded, though its legal counsel, to both Infinity and the Funds as follows:

> *Messrs. Fantozzi and Izzo [of Infinity]:  please be aware that CVSE vehemently disputes the retroactive audit findings which form the bases for the OOE Fringe Benefit Fund's alleged claims.  Mr. Barch [of the Funds]:  please instruct the Fund to immediately cease such communications.  These activities interfere with CVSE's business contracts and operations, defame its reputation, and are clearly designed to force CVSE into acquiescing to the Fund's calculations.*

(Funds Dep. II at pp. 87-89 and its Exhibit F.)[5]

The Funds admit receiving Chagrin Valley's 11/11/16 response to the email. (*Id.*) However, despite

being aware of exactly what Infinity intended to do (withhold payments from and not award future work to

Chagrin Valley), the Funds did absolutely nothing to object, or even respond, to Infinity's intentions:

Q.      So when you saw this e-mail, you didn't call up Infinity?

A.      No.

Q.      So you see what Infinity is going to do or what they're threatening to do, correct?

A.      I can read the e-mail, yes.  What they do after that, I didn't have any – you know, I had nothing to do with that.

Q.      Were you shocked by this?  Did you call Infinity up and say, oh, my goodness --

A.      No, I told you I had no other contact with Infinity.

Q.      So even though they're taking action that was directly contrary to what your expectation was, you didn't feel the need to call anybody and discuss this with them?

A.      No.

---

[5] Ruple Builders, not Chagrin Valley, submitted a bid to Infinity for the Project, which Infinity accepted. Infinity then erroneously issued its Project contract to Chagrin Valley rather than Ruple Builders.  As a result, Chagrin Valley properly requested that Infinity re-issue the Project contract (and other contracts) to Ruple Builders, which Infinity did.  Indeed, as a "labor only" company, Chagrin Valley could not have performed the entire scope of the Project contract with Infinity, which required materials, services and equipment.  This is the situation of the "recently changed subcontracts" referenced by Infinity in its 11/10/16 email to John Ruple. (Ruple Aff. at ¶38.)

(Funds Dep. II at 100-101.)

Indeed, the Email achieved the Funds' and Helmick's true desired result - - to damage Chagrin Valley's reputation and interfere with its business relationship with Infinity.  Infinity has not hired Chagrin Valley or Ruple Builders for a single project of any substance since the Email, yet between 2012 and the date of the Email, Chagrin Valley and Ruple Builders received between $500,000 and $964,0000 in contracts each year from Infinity.  However, in 2017, Chagrin Valley has not received a single contract payment from Infinity, and Ruple Builders only received $386,000 in contract payments, for contracts which were in place prior to the Email. (Ruple Aff. at ¶36.)[6]

Furthermore, since receiving the Email, Infinity also delayed and/or withheld, without explanation, the contract payments due Chagrin Valley, through Ruple Builders, on (ironically) the Project, for which Infinity is the general contractor and one of the Plaintiffs herein is the owner.  (*Id.* at ¶37).  Change Orders submitted by Chagrin Valley, through Ruple Builders, on this Project were inexplicitly denied, and at one point, Ruple Builders and Chagrin Valley were asked to leave the Project and not to return, without any explanation whatsoever. (*Id.)*  Infinity also advised Chagrin Valley that it received these decisions, instructions and directions from the Project owner, who is a Plaintiff in this lawsuit.  (*Id.*).  (Wilson Aff. at ¶9, ECF No. 35, Ex. A.)  Yet unbelievably, the Funds and Helmick now admit that Chagrin Valley (through Ruple Builders) should have received the payments:

> Q. If I told you that Ruple Builders indeed did not receive payments on this particular project, would you be surprised?
> A. Yes.
> Q: Why would you be surprised?
> A: If they did the work, they should get paid.

(Funds' Dep. II at p. 102.)

**E. Helmick is a party to this lawsuit.**

The Funds filed their Complaint against Chagrin Valley on November 11, 2016. (ECF No. 1.)  Chagrin Valley filed its Answer, Counterclaim, and Third-Party Complaint against the Funds and Helmick on January

---

[6] Obtaining the full discovery on these issues from the Funds, Helmick and Infinity has been difficult. Indeed, to date, requested discovery on these issues remains outstanding from both the Funds and Infinity. Chagrin Valley reserves the right to supplement its dispositive motion briefing upon receipt of the outstanding discovery, if necessary.

13, 2017. (ECF No. 7.)  As amended, Chagrin Valley asserts a counterclaim against the Funds for breach of the 2012 CBA, declaratory judgment, tortious interference with business relations, and defamation. (Second Amended Counterclaim and Third-Party Complaint, ECF No. 29.)  Chagrin Valley also asserts claims for tortious interference with business relations and defamation against Helmick.  (*Id.*)

The Court issued a Summons for Helmick in connection with the Third-Party Complaint on December 9, 2016.  (ECF No. 12.)  The Court's docket shows that the Summons was returned as executed on January 24, 2017.  (*Id.*)  Chagrin Valley had no reason to believe that Helmick did not receive a copy of the Third-Party Complaint. In fact, Helmick has appeared in this case multiple times with legal counsel, who also advised Chagrin Valley of its representation of the Funds *and Helmick* in this litigation.

But most importantly, the Funds *and Helmick* filed a motion to dismiss the Counterclaim and Third-Party Complaint on February 3, 2017.  (ECF No. 13.)  The Motion to Dismiss does not raise the defense that Helmick was not properly served.  (*See generally, id.*)  Helmick then continued to participate in the case for months without asserting that he was not an actual party, including by submitting a Stipulation for Leave to Plead (ECF No. 14), a 26(f) report (ECF No. 16), a Motion to Strike the Counterclaim and Third-Party Complaint (ECF No. 20), and attending the Funds' fact witness deposition of Victoria Ruple (ECF No. 35, Ex. 2).  Interestingly, even the pending Motion for Summary Judgment Motion was filed on behalf of both the Funds and Helmick.

In summary, multiple and genuine disputed facts exist which prohibit judgment as a matter of law in the Funds' favor.  Indeed, the overwhelming evidence actually supports judgment in Chagrin Valley's favor on all counts of its complaint, counterclaim and third-party complaint.

## II.  LAW AND ARGUMENT

### A.  Chagrin Valley was not "clearly" required to make contributions on behalf of its employees performing non-operator work.

The Motion relies on the Funds' and Helmick's central contention that "Chagrin Valley clearly was not making contributions as required by the CBA."  (Motion at 9).  Chagrin Valley disputes this fact for multiple reasons.

1.   The parties modified 2012 CBA, and all previous agreements.

The 2012 CBA (the current agreement) became effective in June 2012.  It mandates that fringe benefits must be paid for all hours worked, just as the previous CBAs required (and which the Funds did not follow). It also clearly states that its terms may be modified.

Here, the Funds expressly permitted Chagrin Valley to pay fringe benefits for operator hours only, through February 1, 2013, which the 2012 was already in effect.  Furthermore, by agreeing to the Union's proposed "waiver reductions," the Funds themselves calculate certain contributions allegedly due from Chagrin Valley in a manner not permitted by the 2012 CBA, and in amounts never agreed to by Chagrin Valley.  The Funds also agreed that the hours Mr. Urch worked for companies other than Chagrin Valley, at the Union's direction, would not be calculated against Chagrin Valley or Mr. Urch (or his health insurance benefits).

By these actions, the Funds clearly modified the 2012 CBA. Nothing in the 2012 CBA permits the Funds to subsequently, and unilaterally, renege these modifications.  Yet this is exactly what the Funds are attempting to do. Accordingly, the 2012 CBA modifications should be enforced to entirely bar the Funds' claims.  At the very least, genuine disputed fact exists as to which 2012 CBA terms the parties modified.

2.   The 2012 CBA is void *ab initio* due to fraud in the execution by the Union and the Funds.

The 2012 CBA is void *ab initio* due to fraud in the execution committed by **both** the Union and the Funds.  *Operating Engineers Local 324 Health Care Plan, et al., v. G & W Construction Co., et al.,* 783 F.3d 1045 (6th Cir. 2015) ("We allow an employer to raise a defense of fraud in the execution of the contract because success on that defense would render the contract void ab initio and preclude the employee benefit fund from collection.").[7]

A claim for fraud in the execution exists when a party was led "to believe the nature of his act is something entirely different than it actually is." *Iron Workers' Local No. 25 Pension Fund v. Allied Fence and Security Sys.*, 922 F.Supp. 1250, 1257 (E.D. Mich. 1996) (internal citations omitted). A claim for fraud in the execution arises when a party signs onto an agreement "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms." *Id.*  A contract procured through fraud in the execution is

---

[7] Chagrin Valley's Motion for Leave to file First Amended Answer to Assert Additional Affirmative Defense (Fraud in the Execution) remains pending before this Court.  (ECF No. 42.)

void.  *See id.*

Federal courts, including numerous courts in the Sixth Circuit, hold that summary judgment in favor of a benefit fund is inappropriate where there remains a question as to whether a union representative obtained the employer's consent to be bound by the agreement based on misrepresentations as to the nature of that agreement.  *See id.* (holding that fraud in the execution was a viable defense where the union representative represented that the collective bargaining agreement only applied to one job, but it actually applied to all jobs); *Orrand v. Keim Concrete Pumping, Inc.,* No. 2:08-CV-1046, 2010 U.S. Dist. LEXIS 89215, at *51 (S.D. Ohio Aug. 30, 2010) (denying motion for summary judgment "[s]ince Keim Concrete's counterclaim and affirmative defense of fraud in the execution remains, however, liability has not been determined for fringe benefit contributions under the 2004 CBAs and the 2008 Ohio Highway Agreement during the audit period."); *Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel*, 976 F. Supp. 683, 690 (E.D. Mich. 1997) (holding that the defense of fraud in execution prevented summary judgment in favor of the fringe benefit fund where the Union specifically instructed the employer that the collective bargaining agreement at issue only applied to one job, not all jobs); *Trs. for the Upper Peninsula Plumbers' & Pipefitters' Health & Welfare Fund v. Frazer*, No. 2:05-cv-266, 2006 U.S. Dist. LEXIS 18938, at *19 (W.D. Mich. Apr. 13, 2006) ("[c]ourier's representations to defendant about defendant's obligations [under a collective bargaining agreement] were clearly false.  Whether defendant had actual or constructive knowledge that the language of the collective bargaining agreement would not allow him to just pay contributions to a pension fund is clearly a disputed issue in this case.  Accordingly, summary judgment is not appropriate on whether fraud in the execution could render the short form agreement void.").

Here, the Union **and** the Funds clearly knew and agreed that the 2012 CBA did not apply to Chagrin Valley's employees when they were not performing operator work.  The Union presented the 2012 CBA for Chagrin Valley to sign.  Chagrin Valley's belief that it was agreeing to a continuation of the manner and method of calculating payments that had been employed for ***nine years*** was reasonable and justified.  In fact, the Union confirmed to the Funds, *in writing*, that it permitted Chagrin Valley's calculation methods - - the same methods the Funds themselves approved for years.  The Union permitted Chagrin Valley's calculation methods - - the same methods the Funds themselves approved for years. (Exhibit B-2.)  Furthermore, the Funds' own records

confirm their knowledge and approval of Chagrin Valley's calculations. (Exhibit B-1.)

The Funds routinely audited payroll records from Chagrin Valley that clearly explained Chagrin Valley's fringe benefit contribution calculation methods. The Funds approved all audits of Chagrin Valley's records for nine years. By the Funds' own statements, they never discontinued any health insurance benefits of Chagrin Valley's employees until 2017. (Exhibit C.).

Moreover, when Chagrin Valley signed the 2012 CBA (and the previous CBAs), neither the Funds nor the Union advised that they would change the practices they employed over the previous nine years. The Funds and the Union accordingly confirmed that Chagrin Valley's belief was not only reasonable, but true. Furthermore, **the Funds admittedly permit the Union to make agreements on the Funds' behalf with respect to the scope, application and enforcement of collective bargaining agreements.** (Funds Dep. I at pp. 18-19, 26-27. (ECF No. 27 at Ex. C.) The fact that the Funds knowingly permitted the Union to act on their behalf and make fraudulent representations as to the nature and scope of collective bargaining agreements renders them complicit in the fraud.

3.    <u>The doctrines of waiver and equitable estoppel bar the Funds' claims.</u>

Similarly, the evidence supports that the Funds are equitably estopped from pursuing and have waived to the right to the allegedly delinquent benefit contributions due to their conduct. *See Operating Engineers Local 324 Health Care Plan, et al*., *v. G & W Construction Co., et al.,* 783 F.3d 1045 (6th Cir. 2015) (explaining that equitable estoppel and waiver are separate defenses that both may be viable defenses to a benefit funds' collection action). Sixth Circuit case law is clear that equitable estoppel based on the conduct of the Union alone is not a viable defense "because the funds often are not in a position to know what is going on between the employer and the union, and the union may have interests that differ from or are inimical to the funds' interests." *See Operating Engineers Local 324 Health Care Plan, et al., v. G & W Construction Co*., et al., 783 F.3d 1045 (6th Cir. 2015).

Here, in stark contrast with the cases cited by the Funds, Chagrin Valley's waiver and equitable estoppel defense are based on the conduct of the Funds, not the Union alone. *See id.* (recognizing that a viable equitable

estoppel defense may exist to the extent that it is based on the actions of the fund, as opposed to the union).[8] Chagrin Valley reasonably relied to its detriment on repeated practices and admissions that it owed no contributions to the Funds on behalf of the non-operator work performed by the its employees.  Moreover, the Funds knowingly authorized the Union's representatives to make agreements and define the scope of the collective bargaining agreement on its behalf.  But more tellingly, the Funds themselves approved *nine years'* worth of Chagrin Valley audits that clearly evidence the Funds' and the Union's agreement to Chagrin Valley's calculation methods.

The Funds' assertion that Chagrin Valley is now unequivocally bound by the terms of the applicable agreements, when the agreements were either clearly modified, the Funds themselves did not follow the agreements, or the Funds clearly waived their right to enforce their terms, is absurd.  The Funds' claims against Chagrin Valley are clearly defeated.  Alternatively, at the very least, disputed facts exist relative to the Funds' knowledge, agreements and actions which defeat their Motion.

**B.  Chagrin Valley is not currently underpaying contributions.**

The Funds base their claim for injunctive relief on the fact that "Chagrin Valley has continued to underpay contributions" and that Chagrin Valley has not reported all hours paid after October 1, 2016. (Motion at 13.)  As confirmed by both Victoria and John Ruple (the President and Vice President of Chagrin Valley), upon review of all payroll and related records, these statements are simply untrue.  Indeed, Chagrin Valley's payroll records produced to the Funds in this lawsuit confirms the testimony of John and Victoria Ruple.

In another show of gamesmanship, the Funds base their contention that Chagrin Valley continues to make contributions only for "operator" hours work on a statement Ms. Ruple provided in response to an unclear question, and which she appropriately corrected in her Errata Sheet. The Funds completely ignore Ms. Ruple's testimony that Chagrin Valley is currently making benefit contributions for *all* hours worked. (*See* Victoria Ruple Depo. at p. 27)(ECF No. 35, Ex. 2, and Errata Sheet).

Furthermore, as discussed by this Court in *Orrand v. Keim Concrete Pumping, Inc.,* No. 2:08-CV-1046,

---

[8] The Sixth Circuit has previously declined to address whether equitable estoppel based on the conduct of the funds, as opposed to the union, is a viable defense.  *Wilson v. Blanton*, 2016 U.S. Dist. LEXIS 133421 (S.D. Ohio, E.D.)

2010 U.S. Dist. LEXIS 89215, at *52-53 (S.D. Ohio Aug. 30, 2010), the Funds are only entitled to a permanent injunction if they are able to establish each of the following four elements: "(1) actual success on the merits; (2) a substantial threat that it will suffer irreparable injury without the relief requested; (3) that the threatened injury outweighs any damage that the injunction may cause to others; and (4) that the injunction will serve the public interest." *See id.* (denying funds' request for injunctive relief where it did not meet its burden).

Here, the Funds provide absolutely no support, whether in case law or evidence, for their bald assertion that they will satisfy its burden.  Regardless, the overwhelming evidence detailed above demonstrates that (1) the Funds' claims are easily defeated; (2) and (3), no irreparable harm will come to the Funds, and no "threatened injury outweighs any damage," as the records say what they say, no matter when they are reviewed; and (4) there is no "public interest" to be served; the only interest served is the Funds'.   Indeed, if the Funds desire to review more recent Chagrin Valley payroll records, all they need to do is ask, which they have not done.  Again, the Funds' request for injunctive relief is clearly defeated, or at the very least, disputed facts which defeat their Motion.

### C. The Funds and Helmick defamed Chagrin Valley.

Defamation is a "false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business." *Novotny v. Reed Elsevier*, No. C-3-05-424, 2007 U.S. Dist. LEXIS 66608, at *76-77 (S.D. Ohio Sep. 10, 2007).

The Funds and Helmick set forth various facts that are in dispute with respect to Chagrin Valley's defamation claim, including: (1) "Mr. Helmick's communications was not false" (Motion at 17); (2) "Mr. Helmick's communication to Infinity Construction Co. is protected by qualified privilege" because he shared a common interest with Infinity Construction Co (Motion at 18);  and (3) Mr. Helmick did not act with actual malice" (Motion at 18).

First of all, the Funds and Helmick themselves are unclear as to whether Helmick made the statements on his own volition or upon instruction of the Funds.  (Funds Dep. II at p. 76). Regardless, the issue of whether the Funds' and Helmick's communications were false is certainly in dispute.  In his 11/10/16 email to Infinity, the Funds and Helmick communicated to Infinity that Chagrin Valley owed over $60,000 in delinquent contributions and that Chagrin Valley was not in good standing with the Funds.  Chagrin Valley clearly disputes

that it owes these payments. Furthermore, the Funds and Helmick admit that they knew Chagrin Valley disputed the payments at the time the Funds sent the 11/10/16 email.  The Funds and Helmick admit that no court judgment existed when it sent the email rendering Chagrin Valley liable, while simultaneously admitted that the only thing Chagrin Valley could actually do was to file a lawsuit to assert its position.

Next, the issue of whether "Helmick's communication to Infinity is protected by qualified privilege" because he shared a common interest with Infinity (Motion at 18), remains in dispute.  Ohio law indeed provides a defense to a defamation claim of qualified privilege. *Novotny v. Reed Elsevier*, No. C-3-05-424, 2007 U.S. Dist. LEXIS 66608, at *77 (S.D. Ohio Sep. 10, 2007). However, "[a] qualified privilege exists where the publisher and the recipient have a common interest *and the communication is a kind of communication reasonably calculated to protect or further the common interest*." *Id.* (emphasis added). Once a defendant demonstrates a qualified privilege, the plaintiff can only prevail upon a showing of actual malice.  *Id.*

Here, a question of material fact remains as to whether Helmick's communication to Infinity was reasonably calculated to further a common interest.  Helmick and the Funds have not provided any support for the contention that Infinity had any interest in ensuring that Chagrin Valley was up-to-date on its benefit contributions.  The Funds and Helmick admit that the Funds and Chagrin Valley are not competitors. (Funds Dep. II at p. 108.)  The Funds and Helmick admit that the Funds are not parties to any contract with Infinity which permits the Funds' actions.  (*Id.* at p. 106.)  No Project contract exists between the Funds and Chagrin Valley.  Indeed, Chagrin Valley is not even a subcontractor to Infinity; it is a subcontractor to Ruple Builders, which contracted with Infinity.

Even if a qualified privilege did exist, a question remains as to whether Helmick acted with actual malice in sending the email to Infinity.  *Stein v. McGowan*, No. 1:12-cv-605, 2015 U.S. Dist. LEXIS 6645, at *24-25 (S.D. Ohio Jan. 21, 2015) ("[E]ven if Dr. McGowan establishes qualified privilege with respect to one or more of her defamatory statements, Dr. Stein can still prevail upon a showing of actual malice." In a qualified privilege case, "actual malice" is defined as "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Jacobs v. Frank*, 60 Ohio St.3d 111, 116, 573 N.E.2d 609, 614 (1991). Thus, "[t]he subjective belief of the speaker must be considered in determining whether a statement was made with actual malice." *Mills Van Lines, Inc. v. Prudential Real Estate & Relocation Servs.*, 2011-Ohio-3833,

¶ 19 (Ohio App. 2011).  As this court held in *Stein*, "the issue of actual malice is a question for the trier of fact … that cannot be resolved by the Court on summary judgment."  *Stein*, 2015 U.S. Dist. LEXIS 6645 (S.D. Ohio), at \*24-25.

It is beyond dispute that the Funds and Helmick knew that Chagrin Valley disputed that it owed delinquent payments.  The Funds' own documents and actions confirm that they knew, and/or that the Union told Chagrin Valley, that the 2012 CBA did not apply unless Chagrin Valley's employees covered by the CBA were performing operator work.  The finder of fact could certainly conclude that the Funds and Helmick acted with reckless disregard as to the falsity of whether Chagrin Valley actually owed more than $60,000 in delinquent payments to the Funds.  At the very least, the Funds' and Helmick's Motion should be denied, and Chagrin Valley's claims for affirmative relief should be granted.

**D.  The Funds and Helmick tortiously interfered with Chagrin Valley's business relationship with Infinity.**

Under Ohio law, The Sixth Circuit holds that "a tortious interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *Wilkey v. Hull*, 366 Fed. Appx. 634, 638 (6th Cir. 2010).  The elements for establishing tortious interference with a business relationship are (1) a business relationship; (2) knowledge of the relationship by the tortfeasor; (3) an intentional and improper act by the tortfeasor terminating a business relationship; (4) the lack of privilege on the part of the tortfeasor; and (5) resulting damages. *Hahn v. Rauch*, 602 F. Supp. 2d 895, 906 (N.D. Ohio 2008).

Here, the Funds and Helmick themselves admit that there are facts supporting that they interfered with the business relationship with Infinity: "Chagrin Valley has not alleged or presented any facts regarding interference with a specific third party **except for Infinity Construction Co**."  (Motion at 22.) (emphasis added).  As the Sixth Circuit acknowledges, the question of whether there is a future expectancy of business relationship is one for the fact-finder.  *LidoChem, Inc. v. Stoller Enters*., 500 F. App'x 373, 384 (6th Cir. 2012) ("Whether LidoChem had a valid business relationship or a future expectancy of a business relationship with Boersen Farms or The Andersons are factual questions for the jury.")

Here, the evidence establishes numerous disputed issues of fact.  The Funds and Helmick specifically

asked for Infinity's "help in this matter to get [the Funds] fully paid."  The fact finder could certainly conclude that the "help" the Funds and Helmick requested was that Infinity would use its position as the general contractor to pressure Chagrin Valley to pay the disputed amounts.  This interpretation of the Funds' and Helmick's statement (and their intent) is supported by the fact that this is exactly what happened:  Infinity interpreted this email as a threat, and stated "[w]hatever the dangerous game that John and Vicki are playing is we want to part of it."  Infinity then stated that it would "hold payments on the Operating Engineers project and cease awarding them any more work" if the payments were not made. The Funds and Helmick admittedly knew of Infinity's intentions, but did absolutely nothing to stop it.  Following this, Infinity refused to approve legitimate change orders and has not awarded any more substantial work to Chagrin Valley or to its sister company, Ruple Builders.  This undisputedly caused irreparable damage to Chagrin Valley's business.

Indeed, despite the Funds' and Helmick's "after the fact" testimony that their sole intention in sending the Email was to obtain payment of the fringe benefits *from Infinity*, the Funds and Helmick *admit* that they never articulated this sole intention to anyone, including Infinity.  Again, the Funds and Helmick were fully aware of Infinity's intentions, but they did nothing to stop Infinity's actions.  Indeed, the Funds themselves directed Infinity to bar Ruple Builders and Chagrin Valley from the Project site, and the Funds themselves delayed or rejected certain Project payments due Ruple Builders. (Ruple Aff. at ¶37). The likely interpretation of the Funds' and Helmick's motive in sending the Email was to improperly and maliciously influence one of the Funds' contractors into pressuring Chagrin Valley to make contributions that were in dispute.

### E.  Helmick is a party to this action.

Helmick is a party to this lawsuit.  Even if it were true that "Mr. Helmick has not been served in this Action" (Motion at 23), it is beyond dispute that he has waived any defense relating to insufficiency of service of process.  Helmick, along with the Funds, filed a Motion to Dismiss the Counterclaim and Third-Party Complaint pursuant to Rule 12(B)(6) of the Federal Rules of Civil Procedure.  (ECF No. 13).  Sixth Circuit case law is clear that a 12(B) motion must include the defense of "ineffective service." *King v. Taylor*, 694 F.3d 650, 656 (6th Cir. 2012) ("Therefore, if Taylor filed a motion under Rule 12, but never argued therein that service was defective, he is barred from raising the issue later, and plaintiffs' first theory of waiver must be sustained."). *Bromfield v. McBurney*, No. C07-5226RBL-KLS, 2009 U.S. Dist. LEXIS 130839, at *16 (W.D. Wash. Jan. 30,

2009) (raising the insufficiency of service defense in response to an amended pleading did not resurrect the defense).

Helmick simply failed to raise this defense in his original motion to dismiss Chagrin Valley's third-party complaint, and is therefore barred from doing so now on summary judgment.  Indeed, Helmick cannot use this "defense" as both a shield and a sword, which is exactly what he is doing when participating in this litigation for months, and seeking judgment on Chagrin Valley's claims against him, while simultaneously denying he is even a party to this lawsuit.

**III.**    **CONCLUSION**

For the foregoing reasons, Chagrin Valley respectfully requests that this Court deny the Funds' and Helmick's Motion for Summary Judgment.

> Respectfully submitted,
>
> /s/      *Melissa A .Jones*
> Melissa A. Jones (0074967)
> Angela D. Lydon (0087872)
> FRANTZ WARD LLP
> 200 Public Square, Suite 3000
> Cleveland, OH  44114
> 216.515.1660; Facsimile: 216.515.1650
> mjones@frantzward.com
> alydon@frantzward.com
>
> *Attorneys for Defendant / Third-Party Plaintiff*
> *Chagrin Valley Steel Erectors, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing was filed electronically on November 7, 2017.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ *Melissa A. Jones*

*One of the Attorneys for Defendant /*
*Third-Party Plaintiff*