# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CAROL A. WILSON,** *et al.,*

      **Plaintiffs,**

      **v.**

**CHAGRIN VALLEY STEEL
ERECTORS, INC.,**

      **Defendant/Third-Party Plaintiff,**

      **v.**

**JUSTIN M. HELMICK,**

      **Third-Party Defendant.**

**Case No. 2:16-cv-1084
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Partial Motion to Dismiss Counts One and Two of Chagrin Valley's Second Amended Counterclaim and Second Amended Third-Party Complaint (*Mot. to Dismiss*, ECF No. 30), Defendant/Third-Party Plaintiff Chagrin Valley Steel Erectors, Inc.'s Memorandum in Opposition (*Mem. Op.*, ECF No. 32), and Plaintiffs' Reply (*Pl. Reply.*, ECF No. 33). Also before the Court is Plaintiffs' Motion for Summary Judgment (*Pl. Mot. S.J.*, ECF No. 35), Defendant's Memorandum in Opposition (*Mem. Op.*, ECF No. 58), and Plaintiffs' Reply (*Pl. Reply*, ECF No. 66). Additionally, Defendant has filed a Motion for Leave to File First Amended Answer to Assert Affirmative Defense, *Instanter* (*Mot. to Amend Answer*, ECF No. 42), and in turn, Plaintiff filed a Response in Opposition (*Pl. Mem. Op.*, ECF No. 52), to which Defendant has filed a Reply (*Def. Reply*, ECF No. 63). Finally, Defendant/Third-Party Plaintiff Chagrin Valley has filed a Motion for Summary Judgment (*Def. Mot. S.J.*, ECF No. 59), to which Plaintiffs have filed an

Opposition (*Pl. Opp.*, ECF No. 67) and Defendant/Third-Party Plaintiff has filed a Reply (*Def. Reply*, ECF No. 68). These motions are ripe for consideration.

## I. BACKGROUND

Carol A. Wilson, Administrator, and the Trustees of the Ohio Operating Engineers Pension Fund, the Trustees of the Ohio Operating Engineers Health and Welfare Fund, the Trustees of the Ohio Operating Engineers Apprenticeship and Training Fund, and the Trustees of the Ohio Operating Engineers Education and Safety Fund ("Plaintiffs" or "Funds") commenced this action to collect allegedly delinquent contributions owed by Defendant Chagrin Valley Steel Erectors, Inc., under the collective bargaining agreements for the Funds, pursuant to Section 515 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1145. (*Compl.*, ECF No. 1.) The Funds and their affiliated trusts are "employee benefit plans" under ERISA. *See* 29 U.S.C. §§1002(3), 1132, and Carol A. Wilson and the Trustees manage the Funds as fiduciaries. *See* 29 U.S.C. §1104. (*Compl.*, ECF No. 1.)

Chagrin Valley Steel Erectors, Inc. ("Defendant" or "Chagrin Valley") is a signatory employer to collective bargaining agreements between the Construction Employers Association and the International Union of Operating Engineers, Locals Nos. 18, 18A and 18B (the "Union"). (*Compl.*, ECF No. 1, at p. 2.) Chagrin Valley executed an Interim Construction Employers Association Agreement ("CEA Agreement") dated April 23, 2012; a Short Form Building Construction Agreement For Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Lorain and Medina Counties In The State Of Ohio ("Short Form Agreement") dated June 20, 2012; and a 2000 Hour Addendum Agreement dated March 31, 2014. By the terms of these Agreements Defendant also became a party to the Agreement and Declaration of Trust (the "Health and Welfare Trust Agreement") that established the Ohio Operating

2

Engineers Health and Welfare Plan, and became bound by the terms and conditions set forth therein. These agreements contain provisions whereby Defendant agreed to make timely payments to the Health and Welfare Trustees for each employee covered by the agreement. (*Compl.*, ECF No. 1, ¶6.)

### A. The Agreements

It is undisputed that Chagrin Valley entered into three different agreements with the Union (collectively, "the Agreements"). On April 23, 2012, Chagrin Valley signed the CEA Agreement for the period beginning May 1, 2012 through April 30, 2016. The Agreement specifically provides that

> the undersigned employer or its successor agree to sign and be bound to the newly negotiated agreement and to pay without exception all newly negotiated CEA increased wages, fringes and other terms retroactive to May 1, 2012.

(*Compl.*, ECF No. 1-1, Ex. A.)

On June 20, 2012, Chagrin Valley signed the Short Form Agreement. The Agreement specifically provides that

> 3. The Company is not represented by any employer bargaining unit nor has any employer bargaining unit authority to act as an agent for the Company; however, the Company agrees to adopt and accept all the terms, wage rates and conditions of the 2012- 2015 CEA Building Agreement (hereafter "The Agreement") except as modified herein. The Company further agrees to make contributions to the Health and Welfare Fund, Pension Fund, Apprenticeship Fund, and Safety Training and Educational Trust Fund as outlined in said CEA Building Agreement.

(*Compl.*, ECF No. 1-1, Ex. A.)

On March 31, 2014, Chagrin Valley signed the International Union of Operating Engineers 2000 Hour Addendum Agreement. The Agreement specifically provides that

> 3. the employer will pay on behalf of the Principal Operating Engineer a minimum of 2000 hours per signatory year into the Ohio Operating Engineers' Health and Welfare Plan;
>
> 4. the employer shall transmit all fringe benefit payments in accordance with the

3

terms and conditions of the collective bargaining agreement and the payment protocols of the Fringe Benefit Fund. . . .

(*Compl.*, ECF No. 1-1, Ex. A.)

**B. The Funds' Claims**

The Funds claim that, under the provisions of the agreements as described in Paragraph 6 of the Complaint, Defendant became a party to Agreements and Declarations of Trust, and is alleged to have failed to make timely payments to: (Count I) the Health and Welfare Trustees; (Count II) the Pension Trustees; (Count III) the Apprenticeship and Training Trustees; and (Count IV) the Education and Safety Trustees. (*Id.*, at ¶¶7, 8, 13, 18, 23.) The allegations of failure to make timely payments stem from the results of Trustees' audits, alleged in the Complaint as follows:

> Count I:
> 8. The Trustees' Field Auditor audited Defendant's payroll records on October 31, 2016. This audit disclosed unpaid contributions for the period August 1, 2015 to October 1, 2016, owed to the Health and Welfare Trustees. Defendant is delinquent in making contributions to the Health and Welfare Trustees in the total amount of $31,338.59.

> Count II:
> 13. The Trustees' audit disclosed unpaid contributions owed for the period August 1, 2015 to October 1, 2016, to the Pension Trustees. Defendant is delinquent in making contributions to the Pension Trustees in the total amount of $25,062.00.

> Count III:
> 18. The Trustees' audit disclosed unpaid contributions for the period August 1, 2015 to October 1, 2016, owed to the Apprenticeship and Training Trustees. Defendant is delinquent in making contributions to the Apprenticeship and Training Trustees in the total amount of $3,132.78.

> Count IV:
> 23. The Trustees' audit disclosed unpaid contributions for the period August 1, 2015 to October 1, 2016, owed to the Education and Safety Trustees. Defendant is delinquent in making contributions to the Education and Safety Trustees in the total amount of $375.96.

(*Compl.*, ECF No. 1, ¶¶7, 8, 13, 18, 23.) Plaintiff seeks judgment in the amount of $60,661.00, plus

accumulated interest charges in the amount of $11,154.47 calculated to August 9, 2017, plus $13.83

per day thereafter and statutory interest in the amount of $11, 154.47 calculated to August 9, 2017,

plus $13.83 per day, with the interest and statutory interest accruing daily until judgment is paid.

The Funds also seek injunctive relief. (*Compl.*, ECF No. 1.)

### C. Chagrin Valley's Counterclaims

Chagrin Valley filed a counterclaim against the Funds, and also added an employee of the

Funds, Justin Helmick ("Mr. Helmick"), as a third-party defendant. (ECF Nos. 7, 18.) Defendant's

Second Amended Counterclaim and Second Amended Third-Party Complaint (*Def. Counterclaim*,

ECF No. 29) assert four claims[1]: (Count I) breach of contract against the Funds; (Count II)

declaratory judgment against the Funds; (Count III) defamation claim against the Funds and Mr.

Helmick; and (Count IV) tortious interference with business relations against the Funds and Mr.

Helmick. (*Id.*) The Funds have filed a partial motion to dismiss Counts One and Two of

Defendant's second amended counterclaim and second amended third-party complaint. (*Mot. to

Dismiss*, ECF No. 30.) Chagrin Valley also moved for leave to file a *First Amended Answer to

Assert Additional Affirmative Defense, Instanter* (ECF No. 42), which is hereby granted.[2] In that

filing, Chagrin Valley provides this factual background:

---

[1] The Second Amended Counterclaim and Second Amended Third-Party Complaint removed Count
Four (tortious interference with contract against the Funds and Mr. Helmick). (ECF No. 29.)

[2] The Sixth Circuit has interpreted Rule 15 to permit the granting of a motion for leave to amend an
answer to assert an affirmative defense. *See e.g., Phelps v. McClellan,* 30 F.3d 658, 663 (6th Cir. 1994)
(district court properly permitted amendment of answer to add a statute of limitations defense). Generally
a request to amend should only be denied when it would result in undue delay, prejudice the opposing
party, or is the result of repeated failures to cure prior deficiencies in the pleadings. *Seals v. General
Motors Corp.,* 546 F.3d 766 (6th Cir. 2008) (allowing defendant to raise affirmative defense after

Since at least 2005, Chagrin Valley contributed fringe benefits to the Funds pursuant certain International Union of Operating Engineers, Union Nos. 18, 18A, and 18B (the "Union") collective bargaining agreements to which Chagrin Valley agreed to participate. *See* Declaration of John Ruple (the "Ruple Dec.") ¶¶5, 9, 11. (ECF Nos. 37, 38 and 41 at its Exhibit A.) In summary, Chagrin Valley routinely paid fringe benefits to the Funds when its covered employees, including family members (the "Family Members"), performed "operator work" (e.g., operating a crane) and did not pay fringe benefits when these employees performed "shop work" (e.g., general business operations). Ruple Dec. ¶¶5, 8, 12. Chagrin Valley's payroll records, which it regularly submitted to the Funds, and which the Funds routinely audited and approved, clearly evidenced Chagrin Valley's fringe benefit contribution calculation methods. Ruple Dec. ¶¶5-9, 12. The Union expressly permitted these calculations, and the Funds agreed to and accepted these calculations and contributions for over nine years. Ruple Dec. ¶¶5, 6, 8, 9, 10, 12; *see also* Exhibits B and C hereto.

Chagrin Valley continued to timely and fully make all fringe benefit payments and contributions under the collective bargaining agreements, including the most recent agreement of 2012 (the "2012 CBA") in the same manner it had done for years -- for the hours that the Family Members performed "operator work" -- with the Funds' and the Union's express knowledge and approval. Ruple Dec. ¶12. Throughout 2012 and 2013, the Funds and the Union continued to agree with and accept Chagrin fringe benefit contribution calculation methods. Ruple Dec. ¶12.

Then, in late 2014 / early 2015, the Union advised Chagrin Valley that in direct contradiction of the parties' approved practices for almost nine years, the Funds may start expecting fringe benefits for all hours (operator hours and shop hours) worked by Chagrin Valley employees, including the Family Members. Ruple Dec. ¶14. Indeed, in May 2014, the Funds audited Chagrin Valley's records, and in July 2014, Chagrin Valley received written notice from the Funds that their "recent audit findings" found Chagrin Valley retroactively delinquent in its fringe benefit contributions in the amount of $58,233.23 for the period between February 2013 to May 2014. Ruple Dec. ¶15.

Throughout the following months, Chagrin Valley routinely communicated with the Union to understand and resolve the Funds' position, given the benefits now in question were calculated and paid in same manner that Chagrin Valley had paid for over nine years in accordance with the applicable agreements, and with Funds' and the Union's full knowledge and express consent. Ruple Dec. ¶¶16-17. Meanwhile, desiring to maintain its excellent relationship with the Union, in August 2014, Chagrin Valley advised that going forward, Chagrin Valley would pay fringe benefits for all hours (shop and operator) worked by Chagrin Valley employees covered by

---

summary judgment had been briefed).

6

the 2012 CBA. Ruple Dec. ¶18. Chagrin Valley has, in fact, done so at all times since August 2014. Ruple Dec. ¶18, 24.

(*Id.*, at pp. 2-3.)

## II. PARTIAL MOTION TO DISMISS

### A. Motion to Dismiss Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (clarifying the plausibility standard articulated in *Twombly*). "A claim has facial plausibility when the plaintiff pleas factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. "All of the well-pleaded allegations of the complaint must be treated as true, though we need not accept Plaintiff's legal conclusions or draw unwarranted factual inferences." *Thomas v. Publishers Clearing House, Inc.*, 29 F.App'x 319, 322 (6th Cir. 2002). The Court "need not, however, accept conclusory allegations or conclusions of law dressed up as facts." *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012). In ruling on a motion to dismiss, the court may consider written instruments that are exhibits to a pleading, as those are considered part of the pleading for all purposes. *Campbell v. Nationstar Mortg.*, No. 14-1751, 611 Fed. App'x 288, 291-92, 2015 WL 2084023, at *3 (6th Cir. May 6, 2015)

(citing Fed.R.Civ.P. 10(c)).  A court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

**B.  The Funds' Partial Motion to Dismiss**

Plaintiffs move to dismiss Counts One and Two of the Second Amended Counterclaim and Second Amended Third-Party Complaint against the Funds for failure to state a claim upon which relief may be granted.  (*Mot. to Dismiss*, ECF No. 30, at p. 5.)  Plaintiffs assert that the breach of contract defense fails because the Funds are not parties to the collective bargaining agreements, but are "third-party beneficiaries of these agreements." (*Id.*, at p. 7.)  Additionally, the Funds assert that any defenses are preempted, because the Funds "initiated this litigation to collect delinquent contributions owed by Chagrin Valley under the collective bargaining agreements for the Funds pursuant to section 515 of ERISA, 20 U.S.C. § 1145." (*Id.*, at p. 3.)

Count One of the Second Amended Counterclaim and Second Amended Third-Party Complaint is a breach of contract claim that alleges that the Funds failed to satisfy their contractual obligations under the Agreements by not properly calculating their audit determinations of Chagrin Valley's payroll records.  The heart of the claim is Chagrin Valley's assertion that the Funds "retroactively dishonor[ed] policies and procedures it previously approved." (*Counterclaim*, ECF No. 29, at ¶27.)  Count Two seeks declaratory judgment that, among other things, Chagrin Valley is "not delinquent and is wholly current" in all payments under the Agreements and therefore not liable to the Funds "for any delinquent contributions, late fees or penalties." (*Counterclaim*, ECF No. 29, at ¶33.)

First, Plaintiffs move to dismiss Count One, asserting that the Funds are not a party to the

8

Agreements, and "Chagrin Valley has therefore failed to adequately plead the elements of a breach of contract claim as a matter of law." (*Pl. Reply.*, ECF No. 33, at p. 3.) Under Ohio law, "[t]o establish a breach of contract, a plaintiff must show that a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages." *Pavlovich v. National City Bank*, 435 F.3d 560, 565 (6th Cir. 2006), citing *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.,* 156 Ohio App.3d 575, 807 N.E.2d 953, 957 (Ohio App. 6 Dist.2004). Plaintiffs refer to the three Agreements, which all set forth contractual obligations solely between the Union and Chagrin Valley. (*Id.*, citing ECF No. 26-1, Ex. A, pp. 1-3.) Insofar as Chagrin Valley refers to a contractual duty owed under the Agreements, "it is very clear that the Funds are not parties to those agreements." (*Id.*, at p. 4.) Plaintiffs' assertion is well-taken.

The Funds next assert that the express preemption provision of ERISA, 29 U.S.C. § 1144(a) is broadly worded to ensure that the federal administrative scheme of ERISA is not affected by state laws or state causes of action. (*Mot. to Dismiss*, ECF No. 30, at p. 5, citing *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004).) This provision states that "[t]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a).

In *Cromwell v. Equicor-Equitable*, 944 F.2d 1272, 1275-76 (6th Cir. 1991), the Sixth Circuit explained that "ERISA preempts state law and state law claims that 'relate to' any employee benefit plan as that term is defined therein." 29 U.S.C. § 1144(a). *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). The phrase "relate to" is given broad meaning such that a state law cause of action is preempted if "it has connection with or reference to that plan." *Metropolitan Life Ins. Co. v. Mass.,* 471 U.S. 724, 730, 732–33, 105 S.Ct. 2380, 2385–86, 85

L.Ed.2d 728 (1985); *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). These types of claims are preempted if they "relate to" an ERISA plan whether or not they were so designed or intended. *Daniel v. Eaton Corp.,* 839 F.2d 263 (6th Cir.), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988).

Chagrin Valley counters that "Sixth Circuit case law simply does not support the Trusts' position." (*Mem. Op.*, ECF No. 32, at p. 1.) Chagrin Valley cites to *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 469 (6th Cir. 2002) for the proposition that preemption does not preclude a claim where the claim is related only "peripherally" to the ERISA plan. However, in that case, the Court was referring, in *dicta*, to a claim by a beneficiary which involved a simple mathematical calculation of benefits. It is inapposite to the case at bar; Chagrin Valley is not a plan beneficiary.

Chagrin Valley also claims that its breach of contract claim is not preempted by ERISA because its claim against the Funds "relates only to the Participation Agreements. The Participation Agreements do not constitute and are not part of an ERISA plan." (*Id.*, at p. 6.) Chagrin Valley asserts that "claims with a negligible impact on ERISA plans are not preempted." (*Id.*, at p. 7.) However, this contention is unavailing in the case at bar. Defendant's claim would not have a "negligible impact" on the ERISA plan. Chagrin Valley is seeking to enforce a separate interpretation of how the Funds, an ERISA plan, collect benefits. Chagrin Valley offers an interpretation of how fringe benefits should be assessed which is different from the contract provisions set forth in the Agreements to which it is a signatory. As the Sixth Circuit explained in *Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of the USA*, 770 F.3d 414, 419 (6th Cir. 2014), ERISA plan documents are applied as written:

As a threshold matter, GSMT cannot drive a wedge between the Agreement and the Plan and recover as it wishes here. "[T]he written ERISA plan documents govern the rights and benefits of ERISA plan beneficiaries." *Bloemker v. Laborers' Local 265 Pension Fund,* 605 F.3d 436, 444 (6th Cir.2010). Indeed, ERISA itself "is built around reliance on the face of written plan documents." *U.S. Airways, Inc. v. McCutchen,* —— U.S. ——, 133 S.Ct. 1537, 1548, 185 L.Ed.2d 654 (2013). Thus, we recognize the superiority of the written plan documents. *See Health Cost Controls v. Isbell,* 139 F.3d 1070, 1072 (6th Cir.1997). Deprived of its status as a plan document, the Agreement would have no authority to impose additional obligations to an ERISA plan, and "federal courts may not apply common law theories to alter the express terms of written benefit plans." *Id.* Therefore, if the court divorced the Agreement from the Plan, such that the fiduciary duties provided in the Agreement are distinct from the Plan, then the fiduciary duty provisions of the Agreement would be subsidiary to and preempted by the ERISA fiduciary duties.

*Id.*

Additionally, Defendant seeks to rely on alleged past understandings or practices to seek redress against the Funds. However, as the Sixth Circuit explained in *Operating Engineers Local 324 Health Care Plan v. G & W Construction Co.,* 783 F.3d 1045, 1051 (6th Cir. 2015), these types of understandings and practices are immaterial in suits brought to collect delinquent contributions to ERISA funds:

> Because the multi-employer plans may rely on the literal terms of written agreements between the employer and the union, *Joint Admin. Comm. of the Plumbing & Pipefitting Indus. in the Detroit Area v. Washington Grp. In'l, Inc.,* 568 F.3d 626, 631 (6th Cir.2009), any oral understandings or practices between the contracting parties "are immaterial." *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio,* 133 F.3d 955, 959 (6th Cir.1998); *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1154 (7th Cir.1989) *(en banc ).*

*Id.* In that case, the Sixth Circuit explained that § 515 of ERISA "protects and streamlines the procedure for collecting delinquent contributions owed to ERISA plans by employers by limiting 'unrelated' and 'extraneous' defenses. *Id.* Section 515 provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. The Sixth Circuit noted with approval the Seventh Circuit's explanation that

[Multi-employer] plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits.... Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize.... Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must spend. Litigation involving conversations between employers and local union officials—conversations to which plans are not privy—may be especially costly, and hold out especially great prospects of coming away empty-handed.

*Id.* at 1052, citing *Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1151 (7th Cir. 1989)(*en banc*).

For the reasons stated above, Count One, a claim for breach of contract, must fail as a matter of law, as must Count Two, the ancillary claim for declaratory judgment based on conduct alleged in Count One. Therefore, Plaintiffs' Partial Motion to Dismiss Counts One and Two of Chagrin Valley's Second Amended Counterclaim and Second Amended Third-Party Complaint (*Mot. to Dismiss*, ECF No. 30), is well taken.

### III. MOTIONS FOR SUMMARY JUDGMENT

#### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby,* 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52.

### B. Plaintiffs' Motion for Summary Judgment

The Funds assert that they "are jointly-administered, multiemployer fringe benefit programs established for the benefit of employees of contractors who perform work pursuant to collective bargaining agreements with the Union (the "CBA")." (*Pl. Mot. S.J.*, ECF No. 35, at p. 2.) "The Funds are third-party beneficiaries to the CBA. The Funds rely upon employer contributions to provide pension, health and welfare and other fringe benefits to employees and operating engineers working for these signatory contractors." (*Id.*, at p. 3.)

It is not disputed that this action revolves around three agreements signed by Chagrin Valley. First, on April 23, 2012, Chagrin Valley signed the Interim Construction Employers' Association ("CEA") Agreement for the period beginning May 1 2012 through April 30, 2016. The agreement

specifically provides that

> the undersigned employer or its successor agree to sign and be bound to the newly negotiated agreement and to pay without exception all newly negotiated CEA increased wages, fringes and other terms retroactive to May 1, 2012.

(*Compl.*, ECF No. 1-1, Ex. A.) "This agreement makes Chagrin Valley a signatory to the CEA Building collective bargaining agreement between the Construction Employers Association and the International Union of Operating Engineers, Local 18 and its Branches." (*Pl. Mot. S.J.*, ECF No. 35, at p. 3, citing *Compl.*, Ex A at 1, ECF No. 1.) The CBA specifically provides:

> Fringe benefit contributions shall be paid at the following rate **for all hours paid** to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

(ECF No. 35-1, Ex. 1 to Wilson Aff., ¶39,)(emphasis supplied).

Second, on June 20, 2012, Chagrin Valley signed the Short Form Building Construction Agreement for Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Lorain, and Medina Counties in the State of Ohio. The Agreement specifically provides that

> 3. [T]the Company agrees to adopt and accept all the terms, wage rates and conditions of the 2012- 2015 CEA Building Agreement (hereafter "The Agreement") **except as modified herein.** The Company further agrees to make contributions to the Health and Welfare Fund, Pension Fund, Apprenticeship Fund, and Safety Training and Educational Trust Fund **as outlined in said CEA Building Agreement**.

(*Compl.*, ECF No. 1-1, Ex. A) (emphasis supplied).

Third, on March 31, 2014, Chagrin Valley signed the International Union of Operating Engineers 2000 Hour Addendum Agreement. That Agreement specifically provides

> 3. that the employer will pay on behalf of the Principal Operating Engineer a minimum of 2000 hours per signatory year into the Ohio Operating Engineers' Health and Welfare Plan;

4. that the employer shall transmit all fringe benefit payments **in accordance with the terms and conditions of the collective bargaining agreement** and the payment protocols of the Fringe Benefit Fund. . . .

(*Compl.*, ECF No. 1-1, Ex. A)(emphasis supplied).

The Funds argue that Chagrin Valley was bound by the applicable CBA to make fringe benefit contributions on behalf of its employees for all hours worked. Chagrin Valley, on the other hand, makes the argument that it is not so bound, because, in essence, the Funds "retroactively dishonor[ed] policies and procedures it previously approved." (*Counterclaim*, ECF No. 29, at ¶27.)

*1. Applicable Law*

As the Court explained recently in *Wilson v. A & K Rock Drilling, Inc.*:

Collective-bargaining agreements that create pension or welfare benefits plans are subject to rules established in ERISA. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933, 190 L. Ed. 2d 809 (2015). ERISA requires parties to enter into written agreements governing the creation and management of multi-employer fringe benefit funds. *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 561 (6th Cir. 2015). The written agreements must specify the basis on which payments are made to and from the fringe benefit fund, and the Fund administrator is obligated to act in accordance with the written agreements, so long as they are consistent with ERISA. *Id.* The requirement that fringe benefit fund agreements be in writing is further reinforced by the LMRA, which bars an employer from contributing to benefit trusts designated by employer representatives unless the payments are made in accordance with a written agreement. *Operating Engineers Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1051 (6th Cir. 2015). The requirement of having written agreements lends certainty and predictability to employee benefit plans, which serves the interest of both employers and employees. *Id.*

2018 U.S. Dist. LEXIS 11150, at *8 (S.D. Ohio Jan. 24, 2018).

Also, as discussed in Paragraph II. B. above, in a collection action brought by plan trustees to collect delinquent fringe benefit contributions from employers under such written agreements, § 515 of ERISA comes into play. Section 515 provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained

agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C.A. § 1145. This section was enacted to "simplify delinquency collections brought by plan trustees" and it "protects and streamlines the process for collecting delinquent contributions to ERISA plans from employers by limiting unrelated and extraneous defenses." *Wilson v. Bridge Overlay Sys., Inc.*, 129 F. Supp. 3d 560, 568 (S.D. Ohio 2015). Pursuant to § 515 and the policies underlying the rule, the Sixth Circuit has held that ERISA funds are accorded special status. *Id.* The funds are entitled to enforce the written contracts without regard to the understandings of the original parties or common-law contract defenses. *Id.* Thus, employers' defenses to collection actions are extremely limited and the Sixth Circuit has only permitted a few defenses to a collection action. *Id.* at 568-69. Indeed, "the Sixth Circuit has consistently found that employers' written promises to pay contributions to a multiemployer plan are enforceable if they are not inconsistent with law." *Id.* at 568.

Ordinary contract principles govern the interpretation of the CBAs that establish ERISA plans to the extent those principles are not inconsistent with federal labor policy. *G & W Const. Co.*, 783 F.3d at 1051; *see also Orrand v. Scassa Asphalt, Inc.*, No. 2:12-CV-1131, 2014 U.S. Dist. LEXIS 121531, 2014 WL 4272722, at *3-4 (S.D. Ohio Aug. 29, 2014), aff'd, 794 F.3d 556 (6th Cir. 2015) ("When interpreting ERISA plans, federal courts apply 'general rules' of contract law as part of the federal common law."). If the words of a written contract are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933, 190 L. Ed. 2d 809 (2015). In *Adams v. Anheuser-Busch Companies, Inc.*, 758 F.3d 743, 747-48 (6th Cir. 2014), the Sixth Circuit explained:

> If the plan's terms are unambiguous, the administrator must give effect to them according to their plain meaning. *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 556 (6th Cir.1998). Because "the administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person," *Kovach v. Zurich Am. Ins. Co.,* 587 F.3d 323, 332 (6th Cir.2009), an interpretation of the plan contrary to its plain language will be arbitrary and capricious. Moreover, extrinsic evidence may not be used "to create an ambiguity" where none exists. *United States v. Donovan,* 348 F.3d 509, 512 (6th Cir.2003). Thus, any ambiguity that invites an exercise of discretion "must be 'apparent on the face of the contract.' " *Donovan,* 348 F.3d at 512 (quoting *Schachner v. Blue Cross & Blue Shield of Ohio,* 77 F.3d 889, 893 (6th Cir.1996)). The mere fact that parties propose competing interpretations of language in a Plan "does not dictate a finding that the provision is ambiguous." *Shelby Cnty. Health Care Corp. v. The Majestic Star Casino LLC Grp. Health Benefit Plan,* 581 F.3d 355, 370 (6th Cir.2009).

*Id*. Whether a contract's terms are unambiguous is a question of law for the court to determine. *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025 (6th Cir. 2001). Tellingly, "[b]ecause multiemployer plans are entitled to rely on the literal terms of written commitments between the plan, the employer, and the union, the actual intent of and understandings between the contracting parties are immaterial." *Orrand v. Scassa Asphalt*, *Inc.*, 794 F.3d 556, 562 (6th Cir. 2015). In the case at bar, the Court finds that the words of the Agreements are clear and unambiguous. Thus, there are very few defenses available to the contractor.

## 2. *Chagrin Valley is Obligated to Make Contributions Based on All Hours Worked*

Chagrin Valley states that it "paid fringe benefits to the Funds when its covered employees, including the Family Members, performed 'operator work' (e.g., operating a crane) and did not pay fringe benefits when these employees performed 'shop work' (e.g., general business operations). All of Chagrin Valley's payroll records, which it regularly submitted to the Funds since 2005, and which the Funds routinely audited and approved, clearly evidenced Chagrin Valley's fringe benefit contribution calculation methods." (*Mem. Op*., ECF No. 58, at pp. 1-2.)

However, the CBA unambiguously holds that an employer must make contributions to fringe benefit funds for all hours worked by an employee, regardless of whether the hours were "covered" under the CBAs. (*See* CBA, ECF No. 35-1, Ex. 1 to Wilson Aff., ¶39.) *See Bunn Enters. v. Ohio Operating Eng'rs Fringe Benefit Programs*, 606 Fed. Appx. 798, 802 (6th Cir. 2015) (finding that "the CBA unambiguously requires employer signatories to contribute the appropriate benefits contributions for all hours worked by their employees, regardless of whether those hours are covered under the contract"); *Wilson v. Bridge Overlay Sys., Inc.*, 129 F. Supp. 3d 560, 568 (S.D. Ohio 2015) (holding employer was required to make contribution on behalf of employee for all hours he worked, including hours worked on a machine that was not listed in the CBA); *Noe v. R.D. Jones, Excavating, Inc.*, 787 F. Supp. 759, 764-65 (S.D. Ohio 1992) (rejecting employer's argument that it need not contribute funds for hours spent on supervisory assignments which were not included in the agreements and holding that employer was "obligated to contribute to the Fringe Benefit Funds based upon all the hours worked by the employees, no matter the totality of their assignments"); *Orrand v. Shope*, No. C2-00-1161, 2002 U.S. Dist. LEXIS 28766, 2001 WL 1763437, at *3 (S.D. Ohio Jan. 30, 2001) (granting summary judgment in favor of fund and rejecting employer's argument that it did not owe contributions on behalf of owner's step-brother who did not always work as operating engineer and sometimes got paid for hours he did not work at all). It is irrelevant, then, whether certain work performed was "shop work" outside the scope of the CBA, as Chagrin Valley contends.

### a. Waiver and Equitable Estoppel

Chagrin Valley makes two arguments as to why the Funds are estopped from requiring that contributions be based on all hours worked. First, Chagrin Valley argues that the Funds had permitted it to make fringe benefit payments on only "operator work" "for years" "with the Funds

and the Union's express knowledge and approval." (*Mem. Op.*, ECF No. 58, at p. 3.) Second, Chagrin Valley argues that written documents verify this agreement. Based on this evidence, it asserts that "the Funds are equitably estopped from pursuing and have waived the right to the allegedly delinquent benefit contributions due to their conduct." (*Id.*, at p. 3.) Chagrin Valley seeks to distinguish its waiver and equitable estoppel defense from cases based solely on Union conduct, stating "[h]ere, in stark contrast with the cases cited by the Funds, Chagrin Valley's waiver and equitable estoppel defense are based on the conduct of the Funds, and not the Union alone." (*Id.*, at p. 14.) However, this alleged distinction is unavailing in view of Sixth Circuit precedent.

Equitable estoppel "requires a representation, to a party without knowledge of the facts and without the means to ascertain them, upon which the party asserting the estoppel justifiably relies in good faith to his detriment." *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 319 (6th Cir. 1984).

Chagrin Valley relies upon a document titled "Ohio Operating Engineers Fringe Benefit Programs Contractor Payroll Audit Narrative and Conclusions," dated March 14, 2013, which states that "[r]ecords requested were available only for 10/11 to/including 2/1/13, for audit. No findings were noted." (ECF No. 58-2, Ex. B-1.) The document further states that "[t]he fringe hours remitted equaled the 'Operating Hours' worked." (*Id.*) It also notes that Victoria Ruple "stated the Operating Engineers fringes were paid on 'Crane Work only', that when they worked in the shop/fabricating work, these hours didn't require fringes. That was the agreement when they signed up." (*Id.*) Further, the document states that the auditor "discussed this with D Taggart, District #1 Representative. He was aware of the split time, that 'fabricating work' wasn't under Local 18 descriptions." *Id.* Second, Chagrin Valley further relies on a document titled "Contractor Review &

Follow-Up Response Form" dated February 5, 2014, and signed on May 1, 2014, wherein Mr.

Taggart, the Union representative, states

> I have contacted Health & Welfare to request an audit for this contractor to focus on the three members that they only pay 24 hours on. They are all members that generally fabricate steel in the shop or oil as needed. Jack Klopman II has spoke[n] with the owner about the wage rate, and I have allowed him to use the residential rate on his private work for the work these members do in the shop only at the rate of $26.10. He pays full rate to his operators in the field. We have a 2,000 hour letter for his brother Lowell Ruple.

(ECF No. 58-2, Ex. B-2.)

Chagrin Valley asserts that Plaintiffs should be equitably estopped from pursuing any delinquent contributions, because the Funds and the Union modified the 2012 CBA, and all previous agreements, by their actions.[3] (*Mem. Op.*, ECF No. 58, at p. 12.) However, Chagrin Valley presents no evidence that the written CBA contract documents themselves were modified. Additionally, and fatally for any defense of estoppel, Ms. Ruple, President of Chagrin Valley since 2005, testified at deposition that she had not read the CBA:

> Q. Looking at the first sentence of the first paragraph of the Interim Construction Employers Association Agreement, it states; In consideration of the benefits to be derived and other good and valuable consideration, the undersigned employer or its successor, although not a member of the Construction Employers Association, CEA, does hereby agree to accept and become signatory to the CEA Building collective bargaining agreement. Do you see that sentence?

> A. Yes.

---

[3] The *G & W Construction* court noted that:

> [as] a matter of policy . . .equitable estoppel of third party enforcement of collective bargaining agreements governed by ERISA may well conflict with Congress's objectives in enacting ERISA, *i.e.*, that establishment of employee benefits funds by such plan be in writing and that the funds' fiscal health remain secure.

783 F.3d 1045, 1055-56 (6th Cir. 2015)

Q. Are you familiar with the CEA Building collective bargaining agreement that's being referred to here?

A. Not completely.

Q. Okay. Have you ever read the CEA Building collective bargaining agreement?

A. No.

(*Def. Reply*, ECF No. 52, Ex. A, Ruple Dep., at p. 15-16.)

In *Wilson v. Bridge Overlay Systems, Inc.*, 129 F.Supp.3d 560, 580 (S.D. Ohio 2015), in a case very similar to the case at bar, the Court was presented with a factual scenario where the defendant contractor sought to rely on seven years of past conduct with the Funds (an ERISA plan) to challenge the Funds' suit to collect delinquent contributions. In that case, as in the case at bar, the defendant contractor failed to review the CBA. In finding that a defense of equitable estoppel against the Funds failed as a matter of law in that case, the Court stated:

> First, pursuant to *G & W Construction*, the defendants may not point to the Union's conduct as a basis for equitable estoppel against the Funds. Second, the only action directly attributable to the Funds is their seven-year delay in collecting any fringe benefits payments from Defendant for the hours it paid Miller to operate the Bidwell Paver, particularly after Defendant made some payment in 2006 for Miller's "covered" work. Just as the court concluded in *G & W Construction*, this Court need not determine whether equitable estoppel is available as a defense because the Court concludes that Defendant's failure to review the CBA in order to ascertain his obligation to make fringe benefits payments for all employees defeats its claim of ignorance, as well as any assertion of justifiable reliance on the Funds' failure to collect. Thus, Defendant's equitable estoppel defense fails as a matter of law.

*Id*.

Similarly, in the case at bar, as in *G& W Construction*, Defendant's failure to consult "the agreements themselves . . . to acquire knowledge by reasonable diligence" concerning their obligations to pay benefits based on all hours worked defeats any claim of ignorance. *G & W*

*Construction Co.*, 783 F.3d, at 1056. Additionally, failure to read the CBA defeats any assertion of justifiable reliance on the Funds' previous audits and failure to collect:

> An employer's failure to review the collective bargaining agreements and related plan documents defeats any claim of ignorance, and the defendants' reliance on the Funds' words and actions during previous audits, "in the face of the explicit terms of the agreements establishing" their duty to contribute to the Funds, "cannot be described as justifiable." *Id.*; *Sprague*, 133 F.3d at 404 ("[R]eliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party.")

*Id.*

Under the facts alleged in the case *sub judice*, equitable estoppel and waiver do not constitute a valid defense to the Funds' collection action as a matter of law, whether based on conduct of the Union or the Funds, or both.

### b. Fraud in the Execution

Chagrin Valley moved for leave to file an amended answer to assert an affirmative defense of fraud in the execution. (*Mot. to Amend Answer*, ECF No. 42.) Having considered the discovery history in this case, the Court grants the leave sought and hereby considers the affirmative defense raised by Chagrin Valley in the amended answer, and considers the Funds' memorandum in opposition (*Pl. Mem. Op.*, ECF No. 52), and Chagrin Valley's reply (*Def. Reply*, ECF No. 63). Chagrin Valley also addresses this affirmative defense in its memorandum in opposition to the Funds' motion for summary judgment (*Mem. Op.*, ECF No. 58, at p. 12).

Chagrin Valley asserts that "[t]he 2012 CBA is void *ab initio* due to fraud in the execution by *both* the Union and the Funds," citing *G & W Construction* [783 F.3d 1045 (6th Cir. 2015)] for the proposition that an employer may raise a defense of fraud in the execution of the contract "because success on that defense would render the contract void *ab initio* and preclude the employee benefit

fund from collection." (*Mem. Op.*, ECF No. 58, at p. 12 (emphasis original).) Specifically, Chagrin Valley asserts that summary judgment in favor of a benefit fund has been held to be inappropriate "where there remains a question as to whether a union representative obtained the employer's consent to be bound by the agreement based on misrepresentations as to the nature of the agreement." (*Id.*) Defendant cites to *Orrand v. Keim Concrete Pumping, Inc.*, No. 2:08-cv-1046, 2010 U.S. Dist. LEXIS 89215, at *51 (S.D. Ohio Aug. 30, 2010) wherein the court denied summary judgment because the defendant's counterclaim and affirmative defense of fraud in the execution remained. However, that case involved a different set of facts, where the issue concerned whether the employer remained covered by the 2004 CBA such that executing a new CBA was not necessary for an employee to have health care.

In support of this affirmative defense, Chagrin Valley relies on the same evidence that it used as the basis for its equitable estoppel defense discussed above. This evidence suffers from the same deficiency – for, as the Funds contend, "'[i]n the Sixth Circuit, to demonstrate the excusable ignorance necessary to maintain a fraud-in-the-execution theory, the theorizing party bears the burden to demonstrate that it fulfilled its 'basic responsibility . . . to review the document before signing it.'" (*Pl. Mem. Op.*, ECF No. 52, at p. 7, citing *Wilson v. Bridge Overlay Systems, Inc.*, 129 F.Supp.3d at 571 (S.D. Ohio 2015) (citing *Electrical Workers Local 58 Pension Trust Fund v. Gary's Electric Serv. Co.*, 227 F.3d 646, 657 (6th Cir. 2000).)

The same reasoning this Court applied in *Orrand v. Scassa Asphalt, Inc.*, 2014 WL 4272722 (S.D. Ohio Aug. 29, 2014), applies in the case at bar. Had Chagrin Valley

> reviewed the three contacts that it signed it could not have failed to understand that it was agreeing to join the union, Local 18, to pay into various funds, and to be bound by the larger agreement that was incorporated and referenced in every document that

23

it signed.

> It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.

*Id.* at \*6-7 (citing *McAdams v. McAdams*, 80 Ohio St. 232, 88 N.E. 542, 544 (Ohio 1909)).

Here, as in *Orrand*, the Court notes that the agreements Chagrin Valley signed all reference the CBA, and require the company to accept its terms. As in *Orrand*, the short-form agreement in the case at bar is unambiguous. It clearly states "The Company further agrees to make contributions to the Health and Welfare Fund, Pension Fund, Apprenticeship Fund, and Safety Training and Educational Trust Fund as outlined in said CEA Building Agreement." In short, Chagrin Valley cannot succeed in a claim for "excusable ignorance necessary to maintain a fraud-in-the-execution theory," because it cannot "demonstrate that it fulfilled its 'basic responsibility . . . to review a document before signing it.'" *Orrand*, 2014 WL 4272722, at \*5 (citing *Hetchkop*, 116 F.3d at 34).

## C. Defendant's Motion for Summary Judgment

In determining whether Chagrin Valley's remaining counterclaims are preempted by ERISA, the inquiry is whether the conduct challenged was part of the administration of an employee benefits plan. *See Daniel v. Eaton Corp.*, 839 F.2d 263 (6th Cir.), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988). Chagrin Valley's allegations that the Funds' communications with its contractor defamed Chagrin Valley and tortiously interfered with its business relationships may stem from the Funds' administration of the ERISA plan. Thus, these common law tort claims would likely be preempted, and a disposition by the Court on the merits of these state claims would

therefore be unnecessary. However, even if these claims are not preempted, they are nonetheless unavailing, as discussed below.

Chagrin Valley moves for summary judgment on its counterclaim and third-party complaint against the Funds and Mr. Helmick. (*Def. Mot. S.J.*, ECF No. 59.) The claims that remain are a claim for defamation, and a claim for tortious interference with a business relationship. (*Id.*) The claims are based on an email sent on November 2, 2016, from Mr. Helmick, as Field Representative for the Ohio Operating Engineers Fringe Benefits Programs, to Patrick Smith, the Controller for Infinity Construction Company. (ECF No. 29, at p. 16, Ex. B.) The email states:

> Patrick[,] Hello, per our conversation Infinity Const. has Chagrin Valley Steel Erectors Inc. sub-contracting on a project at the Local 18 Richfield Training Site. Unfortunately Chagrin is not in good standing with our office. Attached is a letter stating the balance of contributions owed. Any help in this matter to get them paid in full would be greatly appreciated. Let me know if you require any additional information.

*Id.* Attached to the email is a copy of a letter the Funds had sent to Chagrin Valley on October 26, 2016, explaining the amounts that it believed to be due to the Funds. (ECF No. 29, at p. 17, Ex. B.)

### 1. *Defamation*

The Funds assert that Chagrin Valley's defamation claim is unavailing because the communication at issue was both true and privileged. (*Pl. Mot. S.J.*, ECF No. 35, at p. 16.) Under Ohio law, the elements of defamation are: (1) the defendant made a false and defamatory statement; (2) the false statement was an unprivileged publication to a third party; (3) the defendant acted with the required degree of fault; and (4) actionability or special harm caused by the statement. *Hout v. City of Mansfield*, 550 F.Supp.2d 701, 747 (N.D. Ohio 2008) (citing *Hahn v. Kotten*, 43 Ohio St.2d 237 (Ohio 1975). As the email communication states, Infinity Construction was the general

contractor "on a project at the Local 18 Richfield Training Site." (ECF No. 29, at p. 17, Ex. B.) That construction project was for the Apprenticeship Fund, one of the Funds that are part of this litigation. (Wilson Aff., ¶9.) The Funds also assert that Mr. Helmick's communication was privileged because he "acts as the Funds' field representative and works with signatory contractors to assure that they pay any delinquent contributions owed." (Wilson Aff., ¶8.) The Funds assert that the communication from the Funds to its general contractor referenced Chagrin Valley as a subcontractor on the job, and attached a letter setting forth the balance of contributions the Funds believed it was owed, and asserted that Chagrin Valley was "not in good standing" with the Funds – which the Funds argue could not be a false statement, inasmuch as Chagrin Valley had not been making payments in accordance with the CBA. (*Pl. Mot. S.J.*, ECF No. 35, at pp. 19-20.) Thus, the Funds assert that this claim must fail, because the statement was not false or defamatory.

The Funds further assert that, in any event, the statement would have been protected by qualified privilege, inasmuch as the Funds, for whom the work was being conducted, had a common interest with its contractor to ensure that the work was being performed in accordance with the terms of the CBA. (*Id.*) The Funds also claim that Ohio courts require proof of "actual malice" in state law defamation claims arising out of labor disputes. *Hout*, 550 F.Supp.2d at 750, (citing *Dale v. Ohio Civil Serv. Employees Ass'n*, 57 Ohio St. 3d 112, 114 (Ohio 1991) holding that plaintiffs must establish actual malice in defamation cases involving labor disputes). The Funds also assert that they are "third party beneficiaries of collective bargaining agreements which set the terms and conditions of employment and require contributions to the Funds as part of the terms and conditions of employment. The communication at issue was therefore a statement about a dispute with an employer regarding the terms of a collective bargaining agreement." (*Pl. Mot. S.J.*, ECF No. 35, at p.

20.)  The Funds contend that, inasmuch as the communication was related to a labor dispute, Chagrin

Valley must establish that the statement was not only false, but that the Funds knew the statement to

be so.  In the first instance, the evidence offered by Chagrin Valley does not meet its burden to show

that the statement was false, therefore, it is also necessarily insufficient to meet the burden of

showing actual malice.  *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d

686 (1964).  Therefore, Chagrin Valley's counterclaim fails as a matter of law and the Funds'

Motion for Summary Judgment (*Pl. Mot. S.J.,* ECF No. 35) on the defamation counterclaim is

**GRANTED.**

### 2.    *Tortious Interference with a Business Relationship*

Chagrin Valley's claim of tortious interference with a business relationship involves the same

electronic communication discussed above, and must also fail as a matter of law.  To establish a

claim of tortious interference with a business relationship, the plaintiff must establish:  "(1) the

existence or the prospect of a business relationship; (2) that defendant knew of the plaintiff's

relationship; (3) that defendant intentionally and materially interfered with the plaintiff's prospective

relationship; (4) the interference was without justification; and (5) the interference cause the plaintiff

to suffer damages."  *Edwards v. Woodforest Nat'l Bank*, 2012 U.S. Dist. LEXIS 72974, *9-10 (N.D.

Ohio May 24, 2012).  "The basic principle underlying a claim of tortious interference is that when

someone acting without privilege, induces or purposely causes a third party to terminate a business

relationship with another, then that person should be held liable for the harm resulting from the

terminated relationship."  *Leisure Sys. v. Roundup LLC*, 2012 U.S. Dist. LEXIS, at 155948, at *91

(S.D. Ohio Oct. 31, 2012) (citing *A&B –Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr.

Trades Council*, 73 Ohio St. 3d 1, 14 (Ohio 1995), 651 N.E.2d 1283 (Ohio 1995).  A claim for

27

tortious inference can be based on the defendant's disparaging comments about the plaintiff's goods, services, or business if the plaintiff establishes that the defendant made the statements with actual knowledge that the statements were false or that the defendant made the statements with reckless disregard as to their truth or falsity. *A&B-Abell Elev. Co.*, 651 N.E.2d 1283 at 1294-95. The Funds assert that, "[w]hen a tortious interference claim is based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements as to defamation is equally applicable to the tortious interference claim." (*Pl. Mot. S.J.*, ECF No. 35, at p. 21, citing *Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc.*, 2016 U.S. Dist. LEXIS 97297, *91 (S.D. Ohio July 26, 2016).) The evidence, taken in the light most favorable to the Funds, simply does not create a genuine issue of material fact as to whether the Funds made the statements with actual knowledge that they were false, or with reckless disregard to their truth or falsity. The defendant has simply failed to support the counterclaims. Accordingly, Chagrin Valley's counterclaim fails as a matter of law and the Funds' Motion for Summary Judgment (*Pl. Mot. S.J.*, ECF No. 35) on the tortious interference with a business relationship counterclaim is **GRANTED.**

Chagrin Valley's counterclaim and third-party complaint against the Funds and Justin Helmick (ECF No. 7 and 29) must fail as a matter of law.

### D. The Funds are Entitled to Delinquent Fringe Benefit Contributions, Interest, and Liquidated Damages.

29 U.S.C. § 1132(g) provides that when funds prevail in Section 515 actions, the court must award:

(A) the unpaid contributions;

(B) interest on the unpaid contributions;

28

(C) an amount equal to the great of —

> (i) interest on the unpaid contributions, or

> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorneys' fees and costs of the action, to be paid by the Defendants, and

(E) such other legal or equitable relief as the court deems proper.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under Section 6621 of the Internal Revenue Code of 1986.

29 U.S.C. § 1132(g).

Under this section, the Funds seek unpaid contributions in the amount of $60,661.00; accumulated interest on this amount in the amount of $11,154.47 through August 9, 2017, plus charges of $13.83 per day thereafter; and statutory interest in the amount of $11,154.47 through August 9, 2017, plus charges of $13.83 per day thereafter, with the interest and statutory interest to accrue daily until the date the judgment is paid. Chagrin Valley does not dispute the amount of the statutory award, just that the award is owed in the first place. Thus, judgment is granted in the amount of $60,661.00 plus accumulated interest charges of $11,154.47 and statutory interest charges in the amount of $11,154.47 calculated to August 9, 2017, plus $27.66 per day from August 9, 2017 until the date the judgment is paid. The requested injunctive relief is granted, and counsel will submit separately materials in support of reasonable attorneys' fees and costs.

## IV. CONCLUSION

Based on the foregoing, Plaintiffs' Partial Motion to Dismiss Counts One and Two of Chagrin Valley's Second Amended Counterclaim and Second Amended Third-Party Complaint

(*Mot. to Dismiss*, ECF No. 30) is **GRANTED**, Plaintiffs' Motion for Summary Judgment (*Pl. Mot. S.J.*, ECF No. 35) is **GRANTED**, Defendant's Motion for Leave to File First Amended Answer to Assert Affirmative Defense, *Instanter* (*Mot. to Amend Answer*, ECF No. 42) is **GRANTED**, and Defendant/Third-Party Plaintiff Chagrin Valley's Motion for Summary Judgment (*Def. Mot. S.J.*, ECF No. 59) is **DENIED**.

**IT IS SO ORDERED.**

3-27-2018
**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**